(Decided July 20th, 1858.)

---

LAVINIA E. SCHINDEL by *prochein ami, vs.* ANDREW J. SCHINDEL.

The acts of 1841, ch. 161, 1842, ch. 293, and 1853, ch. 245, relating to the rights of married women, simply protect the property of the wife from the debts of the husband during her life, but in no other way interfere with his marital rights and control over it.·

The provision of the constitution, that the Legislature "shall pass laws necessary to protect the property of the wife from the debts of the husband during her life, *and* for securing the same to her issue after her death," does not operate to change the rights of property acquired by marriage, so as to deprive the husband of all his marital rights secured to him by the common law.

The act of 1853, ch. 245, passed in pursuance of this constitutional requirement, simply carried out *one branch* of the duty imposed on the Legislature, viz., that of protecting the property of the wife from the *debts* of the husband.

A wife living separate from her husband, without his consent and without *justifiable* cause, cannot be allowed *maintenance* out of her *legal* estate which she inherited and was seized and possessed of at the time of the marriage; in such a case a court of equity has no power or jurisdiction to disturb the husband in the exercise of his legal rights over her property, or decree any equitable settlement for the wife out of it.

The causes which will justify a wife in separating from her husband, must be grave and weighty, and such as show an absolute impossibility that the duties of the married life can be performed.

Schindel *vs.* Schindel.

APPEAL from the equity side of the Circuit Court for Washington county.

The bill in this case was filed on the 31st of January 1856, by the appellant against her husband the appellee. It alleges, that the complainant was married to the defendant on the 8th of May 1855, and at the time of such intermarriage she was seized and possessed of a large real and personal estate, inherited from her father, who died in September 1853, and that the real estate, worth upwards of $21.000, had been, previous to the marriage, allotted to her under the act to direct descents, and the personalty amounting to $5000, she had received in course of distribution from her father's estate, and that all of this property real and personal, had passed into the hands and under the control of the defendant as her husband. The bill further charges, that they lived happily together as man and wife, from the time of their marriage until the 2nd day of the following month, when, in the city of Philadelphia, on their return from a bridal tour, the defendant first exhibited the bad and harsh temper and perverse disposition, that has ever since characterised his intercourse with complainant; and then and there without the least cause on her part to justify ill-treatment of any kind, he used the most mortifying and offensive language to her, threatened her with an application for a divorce, and in every respect, on that occasion, behaving in a most unbecoming and unhusbandlike manner; that afterwards, at home, from time to time he abused her with ill, insulting and severe language, exulted over her as having the possession and entire control of her estate, and asserting her exclusive dependence upon him, and at the same time interdicting her in the purchase of things necessary to her comfort and suitable to her condition in life, and that unable any longer to bear with his harsh and cruel treatment, and to relieve herself from her unhappy condition in his society, a separation was necessary, and took place on the 2nd of November 1855.

The bill further charges, that the defendant having absorbed the whole of her personal estate, and being in possession of, and managing, controlling and leasing her real estate, and receiving to himself the whole produce and profits thereof, com-

plainant is thereby deprived of all support whatever, and being so divested of her entire estate, and left utterly without resources by the conduct of the defendant, she was obliged to obtain wearing apparel and other necessaries for her comfort, and suitable to her condition in life upon credit, whereupon the defendant, in the same harsh and cruel spirit before manifested towards her, has personally notified the merchants and shop-keepers in the town where she and defendant reside, not to credit her, by reason whereof she was not only likely to be embarrassed in procuring such necessaries, but to be brought into public contempt and disgrace; that she is advised, that the defendant being now in possession of said personal estate, and in the sole and entire possession and control of the said real estate, and receiving the rents, produce and profits thereof, for his own use and benefit, contrary to her rights and equities, she is entitled to have an account of the same rendered by the defendant, and also is entitled to enjoy her said real estate, in her own name and as her own property, and to her sole and separate use without the interference of the defendant.

The bill then prays, that the defendant be required to account for whatever of the rents, produce and profits, of the said real estate, and other the personal estate of the complainant, which have come into his hands since the said marriage, and that he may be by injunction restrained from collecting or reducing into possession any of the rents, profits and produce of said real estate, due or to become due under any lease or otherwise, or to receive the rents, produce or profits of the same under any lease or otherwise, and that he may be enjoined from managing, controlling, renting or leasing, or in any way intermeddling with said real estate, and that the complainant may have the full enjoyment of her said real and personal estate, to her own sole and separate use, and for general relief.

The answer of the husband admits the marriage, and his possession and control of his wife's real estate, and receipt of the rents and profits of the same as alleged in the bill, and the possession of her personal estate to the amount of about $3400, a large portion of which he avers he has expended in improvements and repairs, upon the land so acquired by his marriage.

Schindel *vs.* Schindel.

He admits and avers, that his said wife some time after their marriage left his house and her own proper home, and went to the house of her mother, where she has ever since continued to reside with her said mother and respondent's brother and wife. He altogether and utterly denies, that he ever ill-treated or abused his said wife, or ever gave her any just or colorable cause for leaving his house, care and protection, and avers that she voluntarily left the same where she was well and comfortably provided for, without his consent and altogether against his wishes and remonstrances. He avers that the course of his said wife has been instigated by the evil counsels and baneful influence of others, and that he has used every effort to reconcile and induce her to return home and live with him as man and wife should live, but that all his efforts were unavailing. He further avers, that he has ever been most indulgent to his wife, gratifying or attempting to gratify her in every want and wish however unreasonable, and while he admits there have been some few occasions, upon which he has been provoked, to speak to her in such unguarded terms, as, though with no intention of wounding, might appear to a sensitive person to be so intended, yet whenever such a thing has transpired, he has always made it his first duty to apply himself most assiduously to making amends and atonement, with which she always appeared to be satisfied at the time, and he is convinced that the charges in the bill, in regard to ill treatment and the manifestations of strong temper are the bare subterfuges of third parties, under whose injurious influence his wife has been and now is, as a pretext for their unjustifiable conduct in the premises. He denies that since the separation she has not been provided for, or, with the means of providing for her comforts; and though he admits that, in consequence of being informed of her making most extravagant bills on his credit, he did interdict all dealing with her on his credit, yet he avers, it never has been his intention for a moment, to deprive her of the means of providing herself with all the necessaries and comforts of life, but he has intended to supply her with ample means to make provision

for her comfort, notwithstanding her undutiful and derelict treatment and behavior.

The defendant filed exceptions to the bill, for want of jurisdiction in the court to grant the relief or any part of it as prayed upon the case stated in the bill, and also to the allegations of the bill, as being insufficient to entitle the complainant to any relief whatever. A commission was then issued and a large mass of testimony taken on both sides, which need not be stated, as its purport is sufficiently indicated in the opinion of this court, as well as in the following opinion of the court below, *(Perry, J.,)* delivered upon passage of the order dismissing the bill:

"The value of the property in controversy, and the importance of the principles to be determined in this case, have given to it an unusual interest, and I do not hesitate to say, that the difficulty in arriving at the meaning of the Legislature, in the acts of 1842, ch. 293, and 1853, ch. 245, and the doctrine of the recent cases of *Logan vs. McGill & Wife*, 8 *Md. Rep.*, 461, and *Unger & Wife, vs. Price*, 9 *Md. Rep.*, 552, has been to me the occasion of much perplexity. It is contended on the part of the complainant, that the acts of 1842 and 1853, vest the property of the complainant in her as a *feme sole*, in disregard to all the marital rights of the husband. In other words, that she is to possess it as if the conjugal relation did not exist as well against him as creditors. The act of 1853 it is urged, does more than protect the property of the wife from the debts of the husband; that it deprives him of all use of, or interest in, or title to her property. For this construction, I have been referred to the case of *Unger & Wife, vs. Price*, recently decided in the Court of Appeals. The court in that case do not determine that she is to hold as a *feme sole*, in all cases in which she may acquire property from a source independent of her husband, but property held or acquired in any of the modes provided for by the act of 1853, would be held by her as a *feme sole*, as against the creditors of the husband.

"In the case of *Logan vs. McGill & Wife*, the Chief Justice says: 'The act of 1842 was designed to authorize the wife to acquire property real and *slaves*, in the particular mode

there pointed out without the intervention of a trustee.' These two cases were decided in contests between the creditors of the husband and the wife, not between husband and wife, and, therefore, are not applicable to this case. By the 3rd art. sec. 38, of the Constitution, it is made the duty of the Legislature, 'to pass laws necessary to protect the property of the wife from the debts of the husband during her life, and for securing the same to her issue after her death.' The Legislature did, in 1853, pass an act entitled 'An act, to protect the property of the wife from the debts of the husband, as required by the 38th section of the 3rd article of the constitution.' This act having been passed, in compliance with the requirements of the constitution, I think it proper to resort to the constitution, to arrive at the probable meaning of the Legislature, and for such interpretation as will accomplish the design of that instrument. Esteeming the cases to which reference has been made, as applying to controversies between creditors of the husband and the wife, and as not deciding the important question in this case, I feel myself unfettered by authority and at liberty to construe these acts as I believe the Legislature designed. The constitution having required the passage of a law, 'to protect the wife's property from the debts of the husband,' and the title of the act of 1853, professing to comply with its requirements in this particular, in my opinion, the law was not intended to deprive the husband of the use of the property. It was only intended to secure it against his creditors. The act by its title intending to accomplish such a design, is it proper to give a construction to the law, by which a change is to be made in the social relations of husband and wife, unknown to the common law, and which requires from her that which would do violence to that delicacy and retirement which is so much admired and encouraged, and so essential to the happiness of the marriage state? To give her a title as a *feme sole*, a title independent of, and distinct from her husband, would, as an incident to such right, require her to make all contracts and agreements and perform all the duties usually expected from the other sex, forcing her from the domestic circle to go out into the community to pro-

tect the right to. and secure the profits of her property. The husband and wife in this case are both alive, and I am required to say whether the husband has been deprived of the control and usufruct of his wife's property during their joint lives. I think he has not. The only restriction of his common law rights, is the one provision which protects her property against his creditors during her life. His control and use of her property remains as far as it is not inconsistent with this protection. He has the right to manage, use and enjoy it, but his creditors cannot take it. Her disability to contract debts and make contracts still exists. She cannot enter into a personal engagement, so as to give a remedy against her for its violation. 2 *Story's Eq.*, sec. 1397. To give her a title in her property in every sense hostile to the husband, and not to have the capacity to contract or assume obligations on her part in respect to it, ought not to be determined but by plain and undoubted legislation. If she could not be sued for violation of agreements made in regard to her property, her contracts would want that mutuality which ought to exist for the protection of the public.

"In the construction of a statute, the preamble is resorted to for the purpose of ascertaining its true meaning. It is esteemed a key to its construction. 4 *G. & J.*, 1, *Canal Co.*, *vs. The Rail Road Co.* As before stated, by the provisions of the constitution, the Legislature was required to pass a law, to secure the property of the wife against the creditors of the husband during her life, and to her issue after her death. The title to the act of 1853, securing the wife's property against the debts of the husband and nothing more, very cogent reasons should exist to give such a statute a more extended meaning. The sections of the act might, if standing alone, render the question still more doubtful, but when I consider the purposes of the constitution, the title of the act, and the great change in the conjugal relations of husband and wife, if such was done, I cannot give the construction contended for. By art. 3rd, sec. 17, of the constitution, 'every law enacted by the Legislature shall embrace but one subject, and that shall be described in the title.' This law, by its title, is intended to se-

cure the wife's property against the debts of the husband, and being confined to that alone, I do not doubt the propriety of esteeming the title a part of the statute, and to be resorted to and considered as a key to its construction as much as the pre-amble. The constitution having such a provision, and this having been required of the Legislature, it cannot be departed from. Indeed it has been decided, that a law would be rendered void if the principle subject of the law was not properly described in the title. 7 *Md. Rep.*, 151, *Davis vs. The State*. There being in the title of the act of 1853, but one subject described, I have looked to that circumstance to aid in its construction.

"The proof does not show such conduct on the part of the husband, as to justify the interposition of a court of equity, as claimed in her behalf. To authorise such a proceeding, a wife must show extreme cruelty, such as damage to the person, or such circumstances as to induce a reasonable apprehension of bodily injury. Slight causes, as ebullition of passion, harsh language, peevishness, will not be enough. 2 *Kent*, 129. 4 *Johns. Ch. Rep.*, 189, *Barrere vs. Barrere.* 2 *Md. Ch. Dec.*, 340. *Daiger vs. Daiger. Ibid.*, 351, *Coles vs. Coles.* 3 *Md. Ch. Dec.*, 54, *Bowie vs. Bowie*.

"For these reasons, I am constrained to dismiss the bill of complaint, but, in doing so, I have determined not to award to the defendant full costs, as such is entirely in the discretion of the court. 5 *G. & J.*, 314, *Claggett vs. Salmon.* 12 *G. & J.*, 289, *Lee vs. Pindle.* The defendant has the money and property of his wife, and there is seen in the testimony much for which he can be blamed, enough to justify a decree denying costs to him."

From the order, passed in conformity with this opinion, the complainant appealed.

The cause was argued before Le Grand, C. J., Eccleston, Tuck and Bartol, J.

*Wm. T. Hamilton* and *Thos. S. Alexander* for the appellant:

Schindel *vs.* Schindel.

1st. The wife having acquired the whole of the property in controversy, since the passage of the acts of 1842, ch. 293, and 1853, ch. 245, possesses whatever rights and powers they or either of them secure to her over it. Legislation for the benefit of the wife as to her real property, commenced in this State in the year 1841. By the common law, the husband had a freehold interest during their joint lives, in her freehold property of inheritance, which he could himself hold, enjoy and alien, and which could be taken in execution for his debts, and by the curtesy could hold it after her death. The act of 1841, ch. 161, deprived the creditor of the husband of the power to take this interest in execution during the life of the wife, manifestly intending thereby to secure a benefit to the wife, the husband, however, still possessing the right to enjoy it himself and to alien it. To remedy this and to secure to the wife the certain benefit of her real property, without the power of the husband in any way to deprive her of it, the act of 1842, ch. 293, was passed, which secures to the wife the enjoyment of the specific property mentioned in it, to her sole and separate use. The title, the context and the object in view, are to be considered together to obtain the law governing the case. As a remedial statute, it is to be construed liberally to effectuate the object in view. *(Dwarris on Statutes,* 718 to 721. 1 *Kent,* 464, 465.) Statutes are to be construed, with a view to the original intent and meaning of the makers. (2 *G. & J.,* 374, *State vs. Boyd.* 4 *G. & J.,* 152 to 154, *Canal Co., vs. Rail Road Co.)* The title is: "An act to regulate conjugal rights," as they regard property, and such *rights* are alone involved in the title. Then what rights are regulated, affected, diminished or extended? The first section provides, that "any married woman may become seized or possessed of any property real or of slaves, in her own name and as of her own property." This section directs *how* a married woman is to stand seized or possessed of the specific property, whether acquired before or after coverture. *Seizin,* as a technical term, denotes complete investiture, and for a complete title to lands the seizin or possession and right of property are necessary. But how is she to be seized or possessed? "In her own name

and as of her own property." In this the Legislature intended to secure to the wife the right of *enjoyment* as to her property real, otherwise this language would mean nothing, but merely announce what the law was before; for whether covert or sole a woman could always stand seized of her real property in her own name and as her property, and indeed it is only through such seizin in fact or in law, that the marital rights of the husband would attach. "*In her own name,*" are words of definition fixing the *status* of the property, and how it should be held, severing the interest and holding of the husband as before existing by law, and vesting the sole interest in her by the sole investiture in her own name. "*As of her own property,*" are words of illustration showing how absolutely she is to hold it; importing that her seizin is to be as unlimited and absolute as if a *feme sole* or as if the marital right did not attach. The words of the statute are to be taken in their plain signification and import. Technical words when used are to be taken in that sense, unless it appears otherwise from the intent, and words may vary according to the subject, and ought to be expounded to gratify the object. (*Dwarris,* 618, 626. 1 *Kent,* 492. 2 *G. & J.*, 374. 4 *G. & J.*, 152, 153.) Taking these words in their plain and indeed technical signification, and keeping in view the object of the Legislature, and the liberal and beneficient spirit pervading the legislation of the day, in order to secure to the wife the enjoyment of her property, there is by this section a complete and sole investiture or possession of the real property, embraced in its provisions, in the wife, in her own name and as her own property, to be held and enjoyed by her as a *feme sole.* The whole object and scope of this act, are to secure benefits and rights to the wife, first as to her property real and slaves, secondly as to property acquired by her personal labor to a fixed amount, and thirdly she is invested with the right to make a will and give all her property to her husband, and with his consent to others. And this right to make a will can be considered compensatory to the husband for the deprivation of his marital rights by the other sections of the act; for the general influence of the husband over the wife, will almost always secure a just if not a liberal share of her property.

Again, these words of the first section, in themselves, divested of that which generally enters into the construction of an act of Assembly, establish in the wife an estate to her sole and separate use.   Under a will, deed or marriage settlement, such an estate is created either by express words or by just implication.   No technical words are necessary to create such an estate, but adequate language should be employed.   If, from the context of the instrument limiting to the wife the property, it was intended that it should be to her separate use, such intention will be carried into effect.   (2 *Story's Eq.*, secs. 1381, 1384.   3 *G. & J.*, 504, *Carroll vs. Lee.*   9 *Md. Rep.*, 552, *Unger & Wife vs. Price.*   2 *Roper on Husband & Wife*, 152, 160.   *Clancy on Husband & Wife*, 262 to 270.)   Bequeathing the capital sum according to her appointment, whether covert or sole, is sufficient to create such an estate.   (5 *Ves.*, 517, *Lumb vs. Milnes* and *notes.*)   "To pay into her proper hands" held sufficient.   5 *Ves.*, 540, *Hartley vs. Hurle.*

But it may be urged, that although it be conceded that the wife under this act holds her property real to her separate use, it is only that which she acquires in the mode specified, and that that acquired by *descent* is omitted.   So it is in the act of 1853, ch. 245, as to property acquired after coverture.   But, by either act, the property acquired by descent is as much within the reason of the law as property acquired in any other mode.   Though not within the letter if within the meaning and spirit of the act it is sufficient.   "Distribution" is in both acts, and is general, and may in its plain signification apply to all property.   2 *G. & J.*, 374.   4 *G. & J.*, 152, 153.   9 *Md. Rep.*, 552.

In the case of *Logan vs. McGill & Wife*, 8 *Md. Rep.*, 470, this court has said that it was the design of the Legislature by the act of 1842, to give the wife her real estate and negroes as her sole and exclusive property, *without* the *necessity of* the *intervention of a trustee.*   This clearly supports our view of its construction.   If by this act she only had power to *acquire* property, it gave her nothing more than she had at common law.   But this court has said it does more, that she had the power thereby to *hold directly to herself* her property,

without the *intervention of a trustee.* What are the incidents of a wife's holding property by a trustee except for her *separate* purposes? At common law the rights of the wife were very trifling. But as the rights of property have increased, courts have looked favorably upon marriage contracts and settlements, nay they have gone further, and when the estate is a subject of *equity jurisdiction* they will always make provision for the wife therefrom. The acts of 1841 and 1842, only go one step further and break down the remaining harshness of the common law, and give to the wife her property whether it be a subject of *equity* or *of law.*

But if it should be determined that the act of 1842 does not apply to this case, we then insist, that under the act of 1853, ch. 245, the appellant is entitled to relief. This act was passed in obedience to the 38th section of the 3rd article of the constitution, which not only requires the passage of a law to protect the property of the wife from the debts of the husband, but to secure the same to her issue after her death. Under this provision, all legislation as to the rights of the wife, respecting her property, is proper and legitimate, and in securing her this protection can vest in her the powers of a *feme sole* over it, and pass it at once to her sole and separate use. The first section of this law provides, that "the property real and personal, belonging to a woman at the time of her marriage, shall be protected," &c. The property in controversy in this cause, belonged to the wife at the time of her marriage. This act vests in a married woman the powers of a *feme sole* over the property embraced in its provisions, and passes it to her sole and separate use. It modifies the *rights* of the husband and extends those of the wife. By its *third section,* it is not necessary to interpose a trustee, *in order* to secure to a married woman the sole and separate use of *her property,* thus securing to the wife *her property* belonging to her at her marriage, or acquired as prescribed by the first section or otherwise, to her sole and separate use, and that without the interposition of a trustee. In speaking of *her property* in this section, there is no limitation to her separate property to be enjoyed without the intervention of a trustee, but it is *her property* generally,

39    v. 12,

as held or acquired under the provisions of this act or otherwise. In *Unger & Wife vs. Price*, 9 *Md. Rep.*, 557, 558, this court has recently construed this act, and it is there said, that it "has *materially modified* the law as to the *rights* of the *husband* over the property of his wife," that "the *whole scope* and *purpose* of the law, seem to be to *invest a married woman with the powers of a feme sole*, with reference to such property as she may be authorised *to hold and enjoy*, whether under the act of 1853 or otherwise, *to her sole and separate use.*"

If under either of these acts, or both construed together, the wife in this cause holds her property to her separate use, and has the powers of a *feme sole* over it, she can in this form of action obtain the relief sought by the bill, both under the 2nd section of the act of 1853, and by the law applicable to such cases generally in equity. Where no trustee is interposed, the husband in equity is considered trustee as to the wife's separate estate, and is held accountable. And in case of separation, upon the petition of the wife by next friend against her husband, the court will order a conveyance or settlement of it. 9 *Ves.*, 582, *Parker vs. Brooke. Ibid*, 369, *Rich vs. Cockell*. 2 *Myl. & Keene*, 427, *Anderson vs. Anderson*.

It may be said that such legislation, establishing in the wife such powers and estates, is contrary to sound policy, and that it should be discouraged and limited, if possible, by a strict and rigid construction. But when we reflect that individuals can by marriage settlement, deed, will, gift or sale, create such estates, and that courts of equity have always been liberal in maintaining them, and that these courts too, when possessing power over the wife's equity, will set it apart for her separate use, it ought not to be considered wrong or unwise in the Legislature to secure to *all* married women that protection which is generally conceded to be wise, proper and beneficent, on the part of individuals, and which, so far from resulting badly, has been productive of great good. 2 *Bland*, 575, 576, *Helms vs. Franciscus*. 2 *Kent*, 186, 187.

2nd. If the construction of these acts of Assembly, contended for, be erroneous, then, upon the *testimony*, the appellant claims relief under the *general prayer* of the bill, by a sepa-

rate maintenance out of her own estate or otherwise. Whenever courts of equity have power, or in any way jurisdiction, over the real or personal property of the wife, they will allow to her out of it a separate maintenance founded upon the misconduct of the husband, and for sufficient ill-treatment will allow alimony. *Clancy on Husband & Wife*, 560. 2 *Bland*, 574, 576, *Helms vs. Franciscus*. Under either or both of the acts of 1842 and 1853, courts of equity have jurisdiction over the property of the wife. Whilst there are, in some respects, defined limits as to the misconduct and ill-treatment sufficient to obtain a separate allowance out of the estate of the wife for her, or alimony, still there is a wide range, as to what constitutes either, for judicial determination and discretion upon each case as it presents itself. 2 *Bland*, 568 to 576. 2 *Atk.*, 96, *Watkyns vs. Watkyns.* 2 *Vernon*, 493, *Oxenden vs. Oxenden. Ibid.*, 671, *Nichols vs. Danvers. Ibid.*, 752, *Williams vs. Callow.* The proof in this case clearly shows the misconduct of the husband to have been such, as fully to warrant the relief asked by the wife.

*Richard H. Alvey* for the appellee:

1st. The wife here is entitled to no relief whatever, either upon the case stated in the bill, or upon the proof taken. The right sought to be established by this proceeding is an extraordinary one, and goes far beyond any thing that has yet been conceded to the cause of woman's rights. To enable the wife to leave her husband at pleasure, and to take with her, in the retreat, all her property, of every kind and description, to be enjoyed by her, and managed and disposed of as her own, apart from and to the entire exclusion of the husband, and in total disregard of the marital rights, is a monstrous proposition, that, among all the wild theories of improvements, has never yet been advocated in a civilized, christian community, until the bringing of this suit, except by a few erratic and fanatical women, composing what is known as the "Woman's Rights Society." It is true, our legislation for the protection of married women, is of a most liberal character, even to the extent of doubtful propriety; but that it has gone the length of

cutting the cords that bind society together, and of virtually destroying the moral and social efficacy of the marriage institution, is a notion not to be entertained for a moment. But such would be the inevitable result, if such a proceeding as this could be sustained. For let it once be understood that a wife, whenever she may become tired of her husband, or moved by any whim or caprice, may leave him, and take with her the whole property that she ever owned, and enjoy it exclusively, and thus become independent of that superiority and controlling power which the law has always wisely recognized in the husband, what incentive would there be for such a wife ever to reconcile differences with her husband, to act in submission to his wishes, and perform the many onerous duties pertaining to her sphere? Would not every wife, with property enough to sustain herself independently of her husband, when becoming impatient of his restraint and control, however necessarily exercised over her, take the refuge such a law would give her, and abandon her husband and her home? And thus the community would be filled with persons maintaining the unenviable character of husbands without wives, and wives without husbands, indulging in mutual hatred and animosity, bringing disgrace upon themselves, and mortification upon their families and friends.

But such a question is not to be seriously argued here, because there is no occasion for it. The acts of our Legislature, upon which reliance is placed, give no ground for the extraordinary construction placed upon them by the appellant. They were passed for the protection of society, not for the ruin of it. The act of 1841, ch. 161, 1842, ch. 293, and 1853, ch. 245, are to be taken as a series, all relating to the same subject matter, and construed together. The first of these acts only provides for the suspension of execution against the real estate of the wife during her life. The act of 1842, by its first section, provides that "Any married woman may become seized or possessed of any property real or of slaves, by direct *bequest, demise, gift, purchase, or distribution, in her own name, and as of her own property;* provided the same does not come from her husband after coverture." And the act of 1853,

passed in pursuance of the 38th sec. of the 3rd art. of the constitution, by its first section declares, "That the property, real and personal, belonging to a woman at the time of her marriage, and all property which she may acquire or receive after her marriage, by purchase, gift, grant, devise, bequest, or in a course of distribution, *shall be protected from the debts of the husband, and not in any way be liable for the payment thereof.*" Now these acts of 1842 and 1853, admit of no difficulty in their interpretation; and they are to be construed with reference to what we must reasonably suppose was the intent of their authors. The act of 1842 simply authorizes a married woman to acquire property, real and slaves, in the particular modes therein designated, in her own name, and as of her own property, without the agency of a trustee. That is to say, that land and slaves, when conveyed to her in the way designated, expressly as her own property, and slaves are allotted to her in course of distribution, she can hold them under this act without the intervention of a trustee, as her lawful property, in the same manner that she could, before the passage of this act, through the medium of a trustee, hold them by the rules of equity, when expressly settled upon her. The act of 1853, by its terms, is an exemption law, and nothing more, declaring, as it does, that the property owned by the wife, at the time of her marriage, and such as she may afterwards acquire, in the particular modes therein pointed out, "shall be protected from the debts of the husband, and not in any way be liable for the payment thereof." Thus the whole force of this law is made to operate against the creditors of the husband, and not against the husband himself. The intention of all these laws was to protect the wife against the husband's creditors, and not to effect changes in established rules of property, or to divest the husband of any of his marital rights. To do this, it would have required express words and provisions. No implication can be indulged in derogation of the sacred rights of marriage. The marital rights of the husband all remain intact and unimpaired; his right by the curtesy in the real estate, and his right to receive and enjoy the personal estate to the same extent as before the passage of these laws,

except that such property of the wife cannot be taken by creditors for the debts of the husband, remain as formerly. 7 *Md. Rep.*, 26, *Rawlings vs. Adams.* 8 *Md. Rep.*, 461, *Logan vs. McGill & Wife.* 9 *Md. Rep.*, 553, *Unger & Wife, vs. Price.* 4 *Md. Rep.*, 280, *Peacock vs. Pembroke.* 6 *Md. Rep.*, 375, *Turton vs. Turton.* 17 *Missouri*, 47, *Boyce's Adm'r vs. Cayce.* But whatever interpretation might be placed on the act of 1842, it clearly has no application to this case. The wife here sets up no claim to any slaves, and the real estate belonging to her she inherited before marriage, so that it was not acquired by her as a married woman in any of the ways enumerated in that act. At the time of filing this bill there had been no child born of the marriage, but since that time, according to the proof, there has been issue born, and, by this event, the husband is clothed with an absolute estate for his own life in the land of the wife, with right to take the issues and profits thereof as his own property. 2 *Kent*, 130.

2nd. The proceeding here showing that none of the property is of an equitable character, nor such as a court of equity can control or take cognizance of, and that the reduction into possession of the wife's *choses in action* is not involved, the whole property being in the absolute possession of the husband, the wife can have no claim to any equitable settlement out of such property. 3 *Md. Rep.*, 1, *Wiles vs. Wiles.*

3rd. It is not every imaginary cause or slight offence that will justify a wife in leaving the house of her husband, and remaining apart from him. Mere austerity of temper, petulance of manner, or sallies of passion, if bodily harm be not threatened, will not justify such a step. It is necessary that there be a reasonable apprehension of bodily hurt, or otherwise she is entitled to no relief from a court of equity on the ground of cruel treatment from her husband. It is not pretended here that the wife was in any danger of bodily harm or injury, or that she apprehended any such treatment from her husband, but that the cruelty she experienced was harsh and mortifying language used by him towards her, whereby her feelings were wounded. Such treatment as that complained of did not, by

Schindel *vs.* Schindel.

any means, justify the course pursued by the wife in leaving her husband, and not being justified, she is not entitled to a divorce, even if the bill had been framed with reference to such relief. 2 *Hagg*, 35, *Evans vs. Evans*, in 4 *Eng. Eccl. Rep.*, 310. 2 *Kent*, 126. 4 *Johns. Ch. Rep.*, 187, *Barrere vs. Barrere*. 2 *Md. Ch. Dec.*. 351, *Coles vs. Coles*. 3 *Md. Ch. Dec.*, 52, *Bowie vs. Bowie*. And, for the same reason, upon a bill properly framed, asking such relief, she would have no claim for maintenance and alimony. By her unjustifiable conduct, she has forfeited all claim to such extraordinary aid from a court of equity. 2 *Story's Eq.*, secs. 1419, 1421 to 1426. 3 *Md. Rep.*, 1, *Wiles vs. Wiles*. The only grounds upon which she can ask for relief is, that she has been, *by necessity*, driven from her husband's house, and that the court has equitable control over the property; (6 *H. & J.*, 485, *Wallingsford vs. Wallingsford;* 2 *Kent*, 103;) neither of which exist in this case. Nor could she even procure the necessaries of life upon the credit of the husband, while remaining separate, having left him without sufficient cause. 2 *Kent*, 147.

4th. Conceding, however, for the sake of the argument, what is contended for on the other side, that the wife has a separate and absolute property, still the husband here being all the while ready, able, and willing to maintain his wife, and she, without sufficient reason, refusing to live with him, he would be entitled to receive the rents, income and profits of such separate estate, and the court would not deprive him of them, to make provision for the wife out of them. 2 *Ves., Jr.*, 191, *Ball vs. Montgomery*. 4 *Ves.*, 15, *Macaulay vs. Philips. Ibid.*, 799, *Bullock vs. Menzies*. 10 *Ves.*, 90, *Murray vs. Lord Elibank*. 1 *Daniel's Ch. Pr.*, 123 to 128. So that in no point of view can the wife receive any relief under the circumstances of this case; and the bill, therefore, was properly dismissed by the court below.

BARTOL, J., delivered the opinion of this court.

The bill in this case is filed by the appellant against her husband, the appellee, claiming—1st, an account of the rents, produce and profits of the real and personal estate belonging

Schindel *vs.* Schindel

to the wife at the time of the marriage, and which are in the hands and possession of the appellee. 2nd, that the husband may be restrained by injunction from collecting the rents, profits and produce of her real estate, and from managing, controlling, renting, or leasing, or in any way intermeddling with her said real estate. 3rd, that the complainant may have the full enjoyment of her real and personal estate, to her own sole and separate use. And lastly, for general relief.

The record shows that the appellant and appellee were lawfully married on the 8th day of May 1855, and that about the 1st day of November following, the appellant left the residence of her husband, returned to that of her mother, and has ever since been living in a state of separation from him, against his consent. At the time of the marriage, she was seized and possessed of real and personal estate, which passed into his possession and control, and the claim for specific relief is based upon the construction placed by the appellant upon the several acts of Assembly of 1841, ch. 161, 1842, ch. 293, and 1853, ch. 245, and the 38th section of art. 3rd of the constitution.

It has been contended, in support of the bill, that the effect of the several acts of Assembly, and the constitutional provision to which we have referred, is to vest in a married woman a separate and independent estate in all her property, real and personal, exempt from the control of her husband, and entirely free from his marital rights.

This court has said, in the decision pronounced at the present term, in the case of *Saml. E. Schindel vs. A. J. Schindel, (ante* 108,) that such is not the true construction of these several acts of Assembly. In our opinion, there is nothing either in the constitutional provision, or in any of our statutes, which authorizes us to go to the extent of decreeing the specific relief asked for in this case, or to award the injunction prayed for in the bill. What has been said in the opinion of this court pronounced in the case we have referred to, dispenses with the necessity of enlarging upon this branch of the case.

It is sufficient for us to say, that the constitutional provision which declares "that the General Assembly shall pass laws necessary to protect the property of the wife from the debts of

the husband, during her life, and for securing the same to her issue after her death," does not operate to change the rights of property acquired by marriage, so as to deprive the husband of all his marital rights secured to him by the common law. The act of 1853, which was passed in compliance with the constitutional requirement, simply carries out one branch of the duty imposed by the constitution on the Legislature; that is to say, it protects the property of the wife from the debts of the husband, but does not, in any other respect, alter or impair the marital rights of the husband therein. This view is consistent with the judgments of this court in the cases of *Turton vs. Turton*, 6 *Md. Rep.*, 375; *Rawlings vs. Adams*, 7 *Md. Rep.*, 26; *Logan vs. McGill*, 8 *Md. Rep.*, 461; *Peacock vs. Pembroke*, 4 *Md. Rep.*, 280; and *Unger & Wife, vs. Price*, 9 *Md. Rep.*, 553.

The complainant in this case claims that, upon the testimony, she is entitled, under the prayer for general relief, to a decree for an equitable provision for maintenance out of her estate. But in no view which we can take of the facts and circumstances of this case, as disclosed in the testimony, and of the rules of law that must govern our decision, are we justified in granting the relief prayed. None of the property involved in this controversy is of an equitable character. The husband is not asking the intervention of a court of equity for the purpose of obtaining the possession; in such a case it would be in the power of the court having jurisdiction of the property to compel him to do equity by making a suitable provision out of it for her maintenance. Here the estate is legal; it is all in the absolute possession of the husband, by virtue of the marriage, and in such case a court of equity has no jurisdiction or power to disturb him in the exercise of his legal rights, or to decree any equitable settlement for the wife out of the property. This principle was expressly decided in the case of *Wiles vs. Wiles*, 3 *Md. Rep.*, 1. But it is alleged on behalf of the appellant, that she was compelled, by the misconduct and cruelty of her husband, to separate from him, and that she is entitled to a separate maintenance out of the property. We have examined all the proof in the case, and have found

40    v. 12.

no sufficient cause or justification for the separation of the complainant from her husband.

So far as the evidence discloses the causes which led to the complainant's alienation from her husband, there is an entire absence of any such acts of cruelty on his part, as the law declares to be sufficient to justify her separation. It is not necessary to define what is such cruelty, for in this case the acts complained of are none of them embraced within the most enlarged definition of cruelty. "The causes must be grave and weighty, and such as show an absolute impossibility that the duties of the married life can be discharged." This is the principle stated by Lord Stowel, who, in pronouncing the judgment of the Ecclesiastical court, in a case involving the duties and obligations of married persons, said, in language that cannot be too often repeated: "That though in particular cases the repugnance of the law to dissolve the obligations of matrimonial cohabitation may operate with great severity upon individuals, yet it must be carefully remembered that the general happiness of the married life is secured by its indissolubility. When people understand that they *must* live together, except for a very few reasons known to the law, they learn to soften, by mutual accommodation, that yoke which they know they cannot shake off; they become good husbands and good wives from the necessity of remaining husbands and wives; for necessity is a powerful master in teaching the duties which it imposes." *Evans vs. Evans,* 4 *Eng. Eccl. Rep.,* 310.

Considering the case before us as one in which the complainant is separated from her husband without lawful cause or justification, we are of opinion that she is not entitled to a decree for separate maintenance, and the decree of the circuit court ought to be affirmed.

*Decree affirmed.*

(Decided July 20th, 1858.)